IRENE APONTE Y FONTÁNEZ, ETC., Plaintiff and Appellant, *v.* RAMÓN ALONSO MUÑOZ, Defendant and Appellee.

No. 6355.  Argued April 12, 1934.—Decided April 20, 1934.

*Angel A. Vázquez* for appellant.  *Cayetano Coll y Cuchí, V. A. Coll, Diego O. Marrero,* and *Guillermo Silva* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

Irene Aponte y Fontánez, a minor represented by her father, José Aponte, brought this action for damages against

Ramón Alonso Muñoz, whom she accuses of having persuaded her to have illicit sexual intercourse with him under a promise of marriage. It is alleged in the complaint that in March, 1931, the plaintiff enjoyed a splendid moral and social reputation, being single, decent, chaste, and virtuous and reputed until that time to be pure; and that for about two years, previous to the said date, she had had and was having licit and public relations with the defendant Ramón Alonso Muñoz, whom she intended to marry and who was a bachelor whom she could marry without any dispensation whatever; that early in March 1931, the defendant seduced the plaintiff, under the promise of immediate marriage, having illicit sexual intercourse with her, and deprived her of her virginity, in the ward of Monacillos, of Río Piedras; that the plaintiff performed the sexual act with the defendant and surrendered her virginity to him, as the sole and exclusive consequence of the promise of marriage which the said Ramón Alonso Muñoz made to her; that the defendant has not fulfilled and is not disposed to fulfill the promise of marriage that he made to the plaintiff. It is further alleged that the plaintiff has lost the good moral and social reputation which she enjoyed in the community; that she has heretofore suffered and still suffers from illness, insomnia, organic breakdown, and moral grief, as a result of the loss of her virginity, purity, and reputation; that she feels ashamed because of the outrage committed against her honor by the defendant, and that she finds herself unable, for want of her virginity, to marry any other man, and is exposed, through the fault of the defendant, to future misfortune which will bring her no good. The plaintiff claims $20,000 as the damages which she alleges she has suffered.

The defendant denies, for want of sufficient information and belief to admit it, that the plaintiff, on the date fixed in the complaint, enjoyed a splendid moral and social reputation, or that she was single, decent, chaste, virtuous, and reputed until then to be pure. He further denies that he had licit

and public relations with the plaintiff or that he at any time offered to marry her, or that early in March, 1931, or at any other time, he seduced the plaintiff under a promise of immediate marriage; and he likewise denies that he had illicit sexual intercourse with her and deprived her of her virginity in the ward of Monacillos, Río Piedras, or at any other time or place. In the fourth paragraph of the answer, the defendant repeats his denial of having performed sexual acts with the plaintiff in the manner alleged or in any other manner.

The complaint as well as the answer are verified, the former by the father of the minor plaintiff, José Aponte, and the latter by the defendant himself, Ramón Alonso Muñoz.

With the exception of the birth certificate of the plaintiff, who according to the same, was born on March 28, 1916, the evidence presented was all oral. The lower court rendered judgment for the defendant. The appeal taken by the plaintiff is based solely and exclusively on the proposition that the decision was the result of error in the weighing of the evidence. The lower court, in the study which it makes of the witness' statements, questions the testimony of the plaintiff, and doubts its veracity, and, calling attention to the fact that the evidence is conflicting, decides the case in favor of the defendant. Inasmuch as all the questions raised and discussed on this appeal are questions of fact, it becomes necessary to consider and analyze the evidence in order to determine whether or not the lower court committed the error assigned to it, and whether the error, if it exists, is such as to justify the reversal of the judgment.

The girl, Irene Aponte, testified as follows in answer to questions asked by her attorney:

"My name is Irene Aponte; I know Ramón Alonso Muñoz, who is there beside his attorney Mr. Coll, who was my suitor and had promised me and my mother that he was going to marry me, and with whom I had relations for two years. I met him in the house of his overseer Eleodoro Torres, in the ward of Monacillos, Río Piedras, No. 6, which house was located on the farm of Ramón Alonso near

the house belonging to Mr. Jorge Romaní in which I lived; the two farms were exactly opposite each other; I used to talk to Alonso sometimes in the house of Eleodoro Torres and at other times in the house that Alonso had on his farm near the railroad tracks. During my love affair with Alonso he would ask me to elope with him, saying that he would marry me, and I would tell him that I did not dare, that he should speak to my mother, and he would tell me that he would speak to her. I began my relations with Alonso in 1929, and I lived in the ward of Monacillos with my family until the month of August 1930, when we moved to Hato Rey, at which time Alonso continued his relations with me. Alonso used to go to my house, visit me. and take me riding in his automobile; sometimes he came for me in the morning, but he always came for me at night. We went for these rides as sweethearts. On one of these rides he took me to the small house that he has on his farm, at the edge of the track, in the ward of Monacillos, in the car, and there he told me that if I would surrender myself to him he would marry me and he told me that so much that he finally made me surrender myself to him, and there he violated my virginity and lay with me. At that time I was about fourteen years old and a virgin. I had never had any other sweetheart but Alonso. and when I began my relations with him I was only thirteen years old and had never had any other sweetheart. Alonso deflowered me in the month of March, 1931, and I had never gone out with any other man but Alonso, and I surrendered my virginity to him because at that moment he repeated that he was going to marry me that week, for he was expecting to arrange certain things in order to marry. After that day on which Alonso deprived me of my virginity, I continued going with him to that same small house for three or four months more, since he always came for me in an automobile and there in the small house we had sexual intercourse. and he always repeated to me that he would marry me. Alonso has not married me, but he always said that he would. Later he went away and did not come near me again, and then my mother, my father, and I went to him, and I told him that I was going to have him arrested and he, told me 'drop that, for every time that you come, you come only to bother me,' and I had him arrested. After he deserted me in that way I have suffered a great deal; I was ill for some time, there are times when I cannot sleep peacefully; and I was expelled from the congregation 'Children of Mary,' to which I used to belong, because the priest found out that I was not a virgin and he expelled me from the congregation, because I could not be with the other girls.''

To questions of the defendant, she answered:

"I have brought this suit because Alonso offered to marry me. In spite of the fact that Alonso, in the moment before he deflowered me, offered to marry me the following week, I continued going with him three months longer to have sexual intercourse in the small house because he kept putting me off, always offering to marry me, and finally he went away and did not return. When Alonso met me I lived in the ward of Monacillos with my parents, and Alonso had a farm opposite the one on which my parents lived. Around there every one said that Alonso had money, and I believed him when he told me the first time that he was going to marry me, and I did not know whether or not he was deceiving me, for I did not think that he was going to deceive me. He told me that he was going to marry me. I lived in front of Alonso's house for about three years and later we moved to Hato Rey and now we live in the country. All of my family and I lived in Hato Rey for about a year, or nine months. I work at home, at the housework. Alonso was the only one with whom I went out in a car. I have never been ill in a hospital. The only doctors who have treated me are Dr. Moczó and Dr. Mercado. Dr. Moczó treated me for a pain that I have when I am going to menstruate, and the first time that Dr. Moczó treated me for this pain I was a virgin, about three months before surrendering to Alonso, and the last time that he prescribed for me was in March 1931, about two weeks after having surrendered to Alonso; two weeks after having surrendered to Alonso I went to Dr. Moczó for a prescription for this pain and I told him that I had been deflowered. I don't sleep at night thinking of the deceit practiced on me by Alonso. I have never gone to the motion pictures or to the Muñoz Rivera Park. I am always at home working. When I went out with Alonso in the car to go to Monacillos, I did not know that Alonso was going to attempt to make me surrender to him. In three hours, we made the trip, he overcame my resistance, and I surrendered to him."

Filomena Fontánez, plaintiff's mother, testified on direct examination as follows:

"My name is Filomena Fontánez. Irene Aponte is my daughter. I know Ramón Alonso Muñoz, who is here (pointing). In 1929 my family and I lived opposite to the farm of Alonso which they called No. 6, near the shack, and the farm on which we lived belonged to

Mr. Jorge Romaní, and is opposite that of Ramón Alonso. In that year, 1929, I spoke to Alonso, for I called him because he was having secret amorous relations with my daughter Irene, and then he told me that he liked the girl and that he wished to court her, and I answered him that he would have to speak to her father, because I was the mother and could not decide that, which was a question for the father. Then Alonso told me that he was going to court Irene whether I wanted to or not. At that time Irene's father was in the hospital and Alonso went to our house often, three times a week, at night, and as Alonso seemed a reliable person to me, I allowed him to visit my daughter. Alonso told me that he wished to court my daughter in order to marry her, and I told him that my daughter was pure and that she was not to be disgraced, since she was thirteen years old, going on fourteen.

"When he told me that he wished to be my daughter's suitor and to marry her, I warned him that she was a poor girl. He came for her often to take her riding and she went with him and he brought her home. In August 1930, we moved to Hato Rey, and then Alonso went to visit my daughter more frequently because we lived in town and he took my daughter riding every day. In the month of March 1931, when we were living in Hato Rey. Alonso took my daughter away at nine o'clock in the morning and brought her home at noon, because Alonso had taken her to a small house that he had on his farm. When my daughter told me what had happened to her with Alonso we went out to look for him and we found him on the highway, and when I began to talk to him he told me not to prosecute him, that he would marry her. My daughter had not had any other sweetheart and had been going out with Alonso since she was thirteen years old. She went out with no one but Alonso, and no one else came to my house."

## On cross-examination, she testified:

"On the day that Alonso took my daughter away at nine o'clock in the morning and did not bring her back until twelve noon, he brought me a quart of milk. That day I did not talk with my daughter. We treated Alonso as an intimate since he was my daughter's sweetheart and it was public and everyone knew of those relations. When Alonso came to get my daughter in his automobile he always came alone and he went out with her alone, and we allowed her to go because they were sweethearts. My daughter told me what had happened with Alonso three months after it had happened. Irene

lives with us, she never goes out or has any friends, and if she goes out she goes with me, and I allowed her to go out with Alonso because he was her suitor and seemed to be a reliable person.''

José Aponte, plaintiff's father, testified on direct examination thus:

''My name is José Aponte; I am the father of Irene Aponte; I know Ramón Alonso Muñoz, who is sitting there (pointing). In 1929 I was in the Municipal Hospital for three months. In that year Alonso went daily to my house to visit my daughter and I called his attention to it and asked him what his purpose was in visiting my house and then he told me that he was courting Irene and that his purpose was to marry her, with which I was satisfied, but I told him that he could not marry my daughter then because she was only thirteen years old. In the year 1930 I moved with my family to Hato Rey and there he went to visit my daughter daily. One day in March 1931, Alonso came to my house to get Irene and he took her to the country to the ward of Monacillos and there lay with her and deprived her of her virginity. After Alonso had debauched my daughter, Irene, we called him to talk to him, and he told me that he would marry Irene but to be a litle patient, and he admitted that he had deflowered her. I had given Alonso permission to go to my house to visit Irene and he took her riding every day in his car. Irene has had no other sweetheart but Alonso since she was just a child when she began the affair with him.''

Eleodoro Torres, in answer to questions asked by counsel for the plaintiff, stated:

''My name is Eleodoro Torres. I know Irene Aponte, who is here among us, and I also know Ramón Alonso Muñoz, who is there (pointing). In 1929 I was living in the ward of Monacillos of Río Piedras, on a farm belonging to Mr. Alonso, where I worked as overseer. I often went out with Alonso to make the rounds of the farm, and we met Irene there. She also went to my house, as we were neighbors. Irene and Alonso were sweethearts and not only did I know it, but it was also public, and every one saw him visit Irene's house daily. He went there to take her riding and he sometimes took her to the very farm of which I was overseer. Next to a building on the farm used as a dairy, Alonso had a small house and they would both go there, stay a while, and then he would take her home. At the time Alonso and Irene were sweethearts, Irene's repu-

tation in that community was very good. Irene's family and mine exchanged visits frequently and I often went to her house. When I came to live on this farm the first people I met were Irene and her family. I am married and my family and I knew Irene and her family for more than two years and a half, during which time we were neighbors and during that time Irene's reputation was splendid, and she was a child who busied herself with household duties. When she went out, the only man with whom she went out, and came to my house, was Alonso. Irene was then about thirteen or fourteen years old."

To questions put by the defendant, he answered thus:

"I moved from the ward of Monacillos before Irene and her family left there; but they moved in the same month too. After I moved I had heard nothing more of Irene. I left the farm of Mr. Alonso on good terms with him, and the day I left Alonso himself gave me a cart and oxen for moving."

Doctor Luis R. Moczó testified as follows:

"My name is Luis R. Moczó, I am a physician and surgeon and have practiced my profession for six years. I know Irene Aponte, the young woman who is seated there (pointing) and I have treated her, as a doctor, on several occasions for pelvic pains which usually appear at the menstruation period, which pains are vulgarly called cramps. Those pains afflicted her at the menstruation period. I treated her for the first time toward the end of 1930 when she complained of the pain as it was very strong. I put various questions to her and answering them she told me her history and her social position and I prescribed for her and told her to return within a month. At the end of a month, that is, at the end of January 1931, she returned and told me that she had been somewhat relieved, but that the pains still persisted; then I changed the medicine and urged her to come again. In that month of January 1931, as well as in the previous month of December 1930, I only examined the abdomen externally. In February 1931, when she returned and told me that the pains persisted, I examined her abdominally only, and then asked her to submit to an internal examination, but as she told me that she was a virgin I answered that I could examine her even though she was a virgin, and I made a rectal examination to ascertain if there was some pathology in the organs of reproduction. From this rectal examination I could ascertain that Irene Aponte was still a virgin. To examine her I placed her on the table in the proper position and

ascertained that there was a hymen, and an opening through which a pencil could scarcely pass, and then, in order not to harm her, I proceeded with the rectal examination and reached the conclusion that at the time I examined, in February, she was entirely virgin. The following month, that is, late in March 1931, she returned to me and complained of the pains, but then she was not a virgin, and she told me what had happened to cause her to lose her virginity. I verified that at that time she was not a virgin, since I put her on the table, examined her and noted that the hymen was no longer the same as that which existed in the previous months of February, January, and December . . .''

This was the testimony of the witnesses for the plaintiff. Let us see now the evidence introduced by the defendant. Following is the testimony of the witness Félix Rodríguez:

''My name is Félix Rodríguez, I live in Santurce, I know the young woman, Irene Aponte, who is seated over there (pointing) and I have known her since she was a child and had amorous relations with Ramón Alonso Muñoz. At the time that Ramón Alonso had amorous relations with Irene Aponte I was employed by Muñoz as a chauffeur and I took him everywhere. I drove Mr. Muñoz and Irene Aponte many times in the car. Several times I took Muñoz to Irene's house to take her riding, and I paid no attention to what they were saying in the car because I was only paying attention to my driving.''

Then Attorney Coll y Cuchí, counsel for the defendant, put the following question to the witness:

''Do you know me? Have you seen me here?

''A.—Yes, sir, I saw you on the day they tricked me and tried to take me to your office; they offered me $100 to come and deceive the court, and the trick did not come from her, because we had come to see Mr. Ubarri, who was the instructor of jockeys, and before I realized it we were in your office, and we were not going to your office . . . I went to the office of Attorney Coll deceived by Alonso and believing that we were going to see the instructor of jockeys who lives at No. 4 Cristo Street. I went up to the office of Mr. Coll and they called me to a cubicle at the end of the house where Mr. Coll was, and the latter asked me if I could be a witness for Mr. Alonso and I told him that I could not, on any condition, because I was not going to court to tell a lie. Then Mr. Coll told me that I wouldn't do. They offered me $100 there and I said no, because I was not going to deceive the court.

Mr. Coll knows that I never agreed with him to testify in favor of Mr. Alonso under any condition.''

When he was questioned by the plaintiff, the following incident occurred with this witness:

''Q.—Who was it that offered you the sum of $100 to come to testify?

''Mr. Coll: I object to that. We will go into that, but this is not a question to be decided in this proceeding.

''Mr. Vázquez: But he testified to that in this case.

''Mr. Coll: But it is not pertinent.

''The Court: What bearing does the fact that he was offered something to testify have on the decision of this case?

''Mr. Vázquez: No bearing at all. It has no value at all as a question of law; only as a question of fact. Only that the court may appreciate the attitude of the defendant.

''Mr. Coll: No statement of a witness may be imputed to a defendant or to a plaintiff, and much less when the statement of the witness involves a crime. Therefore, what Mr. Vázquez can say is that the witness has said this and that he has said that. Moreover, the court is going to hear me as to the statement of Rodríguez in my office and will then weigh the two statements.

''The Court: It seems to the court that those statements of the witness have no bearing on the case.

''Mr. Coll: I am not going to object to any decision of your Honor's. I shall ask nothing else of the witness.

''Mr. Vázquez: That is all, then.''

The witness Julio Cáceres, upon being examined by the defendant, testified thus:

''My name is Julio Cáceres, I work at farming and at other occupations. I know Mr. Alonso as a property owner, since I have had business relations with him in the purchase of milk which I went to get in a small truck. I knew the young woman when she was the sweetheart of my chauffeur, Félix Rodríguez. On different occasions I went to the home of that young woman for him, then he would come with me.''

To questions asked by the plaintiff, he answered:

''At that time Irene Aponte was living with her father and mother but I do not know where Félix Rodríguez slept nor with whom he slept. Rodríguez was also Alonso's chauffeur.''

Manuel Prida Izquierdo, on direct examination, stated:

"My name is Manuel Prida Izquierdo and I happened to be in the court building while this trial was being held; I live in Hato Rey, Río Piedras, and I know that young woman who is sitting there, who lives near my house. I met her about six or seven months ago and from that time to the present every time I passed her house I saw cars there in front of the house; on many occasions I went to the motion pictures and on my return saw her on the highway. I saw visitors in the house."

To a question put to him by the plaintiff, he answered:

"I saw that the persons who were in the cars spoke to her, nothing more than that."

Pedro Castro, upon being questioned by counsel for the defendant, testified as follows:

"My name is Pedro Castro, I am a merchant in Santurce; I have known that girl who is seated there since 1931; I met her in Hato Rey. One night I saw her in the Estrella Theatre and I began to treat her as is the custom among young people. I asked her if she wanted to go to the movies and she said yes, and as I have a sweetheart there I told the doorman to leave two seats vacant upstairs for me. I had sexual intercourse with her twice, for the price of $2 the first time."

To questions asked by counsel for the plaintiff, he answered:

"I had sexual intercourse with her at Stop 32, in a little house at the entrance to 'Las Monjas.' I cannot remember the day or the month that I went to the movies with her."

Rafael Escobar, on direct examination, testified thus:

"My name is Rafael Escobar, I live at Stop 35, Hato Rey; I am a carpenter. This young woman used to live in that ward. I work for Mr. Jesús Benítez Castaño and it is my custom to go out every night around that section and I would see many persons arrive at the house with cars, having a good time, and she went out in the cars, and afterward I decided to make friends with her, to which she assented. On the property of Mr. Jesús Benítez there were some wooden huts and she consented to have sexual intercourse with me there, more than once and I paid her money."

To questions asked by counsel for the plaintiff, he answered:

"I do not know whether there was a public house of ill repute there and I cannot tell the name of any person with whom she went out in a car, because that is very difficult for me. In 1931, I had sexual intercourse with her. Anyone could go to that place freely and make use of the beds there. I cannot fix the date that I had intercourse with her the second time, but it was two or three days after the first time and I paid her $1."

Marcelino Hidalgo, on direct examination, testified as follows:

"My name is Marcelino Hidalgo, I am an employee and I know that young woman who is over there. One Sunday I was at Stop 22 in Santurce and as she approached a friend of mine began to speak to her, and after they exchanged greetings and a few words, I noticed that they were talking familiarly. My friend introduced us and I asked her if she was going to Río Piedras and invited her to go with us, as we were going there. She accepted the invitation and entered the car with us, and we took her to Stop 35, Hato Rey. We spoke politely to her on the way. During the rest of the week I passed along the highway on different occasions and most of the time I saw her, and afterward I continued to see her riding now with one and now with another person."

In answering questions asked by the plaintiff, he stated:

"I do not remember exactly the month I referred to in my statement, but that day that we took her to Río Piedras it was about four o'clock in the afternoon and we must have reached her house about 4:20, as we were going slowly."

Ramón Alonso was the last witness presented for the defense. Upon being examined by his counsel, he testified as follows:

"My name is Ramón Alonso Muñoz, I know the plaintiff, the young lady who is over there. I knew her first when she was living in the ward of Monacillos, Río Piedras. I knew her mother first. After the San Felipe Cyclone I went one day to my farm in my car and I met the mother of that girl on the way and she asked me to take her to Río Piedras. I took her and on the way she said that she was going to cash a money order, that she did not know how to sign it, and I

signed it and they cashed it. I was friendly with the girl's mother for a time. That is the way I became friendly with the girl, never as a suitor and much less promising to marry her. They came to Hato Rey and one day I saw her father and he called me and told me about their condition. I had sexual intercourse with her on my farm, to which she had already gone several times before that day. When I had sexual intercourse with her she was not a virgin in my opnion; judging from the symptoms there was absolutely nothing like that."

On cross-examination, he said:

"I confess that I have had intercourse twice with the plaintiff and I am the same person who has sworn to the answer to the complaint. I was a bachelor at that time and she was also unmarried. Félix Rodríguez was my chauffeur. I know Eleodoro Torres, who was my overseer. One day, when she lived in Hato Rey, I went to her house."

Irene Aponte testified again in order to rebut the evidence of the defendant with respect to the acts attributed to her. To the questions put by her counsel she answered:

"I am the plaintiff; I do not know Julio Cáceres who has never gone to my house at one o'clock in the morning to look for Félix Rodríguez, since the latter has never slept in my house. Neither do I know Pedro Castro, with whom I have never had a date in the Estrella Theatre, nor has he lived near me, nor have I had sexual intercourse with him. I do not know Rafael Escobar either. I have never been a friend of the latter, nor have I had sexual intercourse with him, since the only one with whom I have had sexual intercourse is the defendant, Ramón Alonso Muñoz. I do not know Marcelino Hidalgo, nor have I gone driving with him anywhere. I have never left my house with anyone in a car nor have I ever heard anyone blow a horn near my house after I was in bed."

Cross-examined by counsel for the defendant, she stated:

"Cars do not stop in front of my house now. I do not know Dr. Boneta, nor have I ever seen him."

At this point counsel for the defendant, Mr. Coll Cuchí, asked the witness the following questions:

"Tell me, witness, is it not true that while you were living as the wife of a man by the name of Rivera you went, on November 23, 1931,

to doctor Luis Boneta, in Río Piedras, for treatment for a hemorrhage that was produced by an abortion of two months, and that you were treated by Dr. Boneta?

"A.—All that is a lie of yours; bring me that Rivera who says that.

"Q.—And why do you not prefer that I bring the doctor?

"A.—The doctor and Rivera, too, because I have never had anything like that."

That is all of the evidence introduced. The lower court, in entering upon the analysis of the same, tells us that the plaintiff relies on the doctrine established by this court in the case of *Tous Soto* v. *Chevremont*, 31 P.R.R. 363, to the effect that "in an action for damages for seduction the law does not require corroboration of the testimony of the plaintiff nor make the promise of marriage a necessary element to establish a cause of action." The court below goes on to say that the plaintiff seems to proceed on the theory that her testimony alone, if believed by the court, is sufficient proof of the seduction, and hence, of the damages alleged to have been suffered; but in this case, although the testimony of Irene Aponte appears corroborated by that of the mother, it has also been controverted by the testimony of the defendant. It is well to point out that this witness, who, according to the lower court, has controverted the testimony of the plaintiff, confessed under oath, when he testified, that he had sexual intercourse with the plaintiff twice, while in his answer he insistently denied, also under oath, having had sexual intercourse with her.

The lower court commits an error of importance in its opinion in reviewing the testimony of Irene Aponte, to whom it attributes the following words: "That she was the sweetheart of the defendant, with whom she had had relations for two years with the intention to marry; that he did not tell her that he would marry her, but he told her mother in her presence." This is the only time that the promise of marriage is mentioned in the lower court's account of the testimony of Irene Aponte, and it is noteworthy that this

mention is made for the purpose of saying that the plaintiff stated that the defendant did not tell her directly that he would marry her, but that he said so to her mother in her presence. The truth is that not only once, but on repeated occasions, Irene Aponte testified in a definite and positive manner that the defendant had told her that he was going to marry her.

The grounds stated by the lower court for questioning the veracity of Irene Aponte are as follows:

". . . The plaintiff is a young woman who, according to her testimony, has always lived with her parents, and who began a love affair with the defendant, who, according to the plaintiff's mother, 'wished to court her because he had the idea of marrying her.' Notwithstanding the pleasant reception that was apparently accorded to the defendant in the house of the plaintiff, the parents daily permitted their daughter to go out for long periods of time, and it was not until three months after the seduction had taken place that the daughter informed her parents of it. This conclusion leads us to connect the testimony of the doctor, who seems to have made the rectal examination alone with the plaintiff, who had more intimacy with the doctor, in telling him what had happened to her, than with her own mother, from whom she kept the act of seduction for three months. It is, then, the testimony of the plaintiff herself which makes us doubt her veracity. If the seduction occurred, as the plaintiff alleges, when she was thirteen or fourteen years old, then it is impossible to consider the statement of the defendant (sic) regarding the sexual acts performed because the victim was less than fourteen years old and had no capacity to consent. The doctrine of the case of *Lebrón* v. *Lebrón*, 31 P.R.R. 842, would be applicable. But the mother of the plaintiff herself says that it was not until 1931 that her daughter told her of what had happened to her with the defendant, in March of the same year. She was already more than fourteen years old. This evidence, together with the expert testimony seems to indicate either that there was a slip in the testimony of the plaintiff, or that the parties conducted the examination of their witnesses hurriedly and the exact and certain fact of the seduction could not be precisely determined, if the same occurred. But going deeper into the testimony of the plaintiff, can we determine from it alone that the seduction occurred due to a promise of marriage made by the defendant? The circumstance that in this kind of action it is neces-

sary to give great weight to the testimony of the plaintiff, does not prevent the court from considering it with the same fairness applied to the rest of the evidence presented at the trial, without the mind of the judge being influenced by the age of the plaintiff, the fact that she is a woman, or her social position. The testimony of the plaintiff should be considered by the court with that calm and judicious reflection demanded by the seriousness of this kind of action, due to the effect its decision has, not merely with respect to defendant's economic condition, but in its moral aspects.''

The evidence shows that Irene Aponte went driving with the defendant, with the permission of her parents, and that one day she left her home at nine in the morning and returned at noon. The lower court is surprised that these rides were permitted to last a long period of time, notwithstanding the good reception accorded to the defendant in the home of the plaintiff. Without stopping to discuss—because that is not our mission—whether the parents did well or not in permitting these rides, we find in this no basis for casting shadows on the reputation of the plaintiff and raising doubts as to her veracity. There may be families that do not permit their daughters to go out driving with any man, and there may be others that permit such drives. The welcome accorded to the defendant in the home of the plaintiff is no reason for the parents to refuse their daughter permission for the drives. On the contrary, the persons who are known and received with pleasure in the bosom of a family are the ones who usually inspire confidence and who often enjoy the tolerance of the parents. The mother of Irene Aponte states that Alonso was treated as an intimate and that she allowed her daughter to go out with him because he was her suitor and seemed to be a reliable person.

The lower court lays emphasis upon the fact that the plaintiff was more intimate with the doctor than with her own mother because she told the former that she had lost her virginity and waited three months to tell her mother what had happened to her. It is not strange for children to be somewhat reserved with their parents and to abstain

from telling them of their mistakes, for fear of being punished, or because of the respect they have for them, or to keep them from sharing their own sorrows. This conduct, however blameworthy it may be in some cases, is not strange or foreign to the frailties of human nature. Moreover, the plaintiff must have known that she could not hide her misfortune from the doctor who examined her and that there was nothing to be gained by denying it.

The lower court points out that the plaintiff alleges that the seduction occurred when she was thirteen or fourteen years old, but that her own mother says that it was not until 1931 that her daughter told her what happened to her with the defendant, in March of the same year. Irene Aponte testified that when she began the affair with Alonso she was 13 years old and that at the time of the seduction she was 14, but she immediately mentions the date on which she was seduced, fixing the month of March, 1931. On the 28th of the same month and year, the plaintiff became 15 years old, and she testified that Doctor Moczó prescribed for her for the last time in the month of March, 1931, about two weeks after she had surrendered to Alonso. From this testimony, produced by the plaintiff herself, and not exclusively by her mother, it is deduced that she was not fifteen years old when the alleged seduction took place.

Immediately after citing the case of *Tous Soto* v. *Chevremont, supra,* to the effect that neither the corroboration of the testimony of the woman seduced, nor the existence of a promise of marriage is an essential element of seduction, the lower court said that the same rule is laid down in *Hardin* v. *Davis,* 21 A.L.R. 302, and it copied the following extract from the opinion delivered in this last case:

"... While a promise of marriage is quite often one of the means employed by the seducer to accomplish his purpose, and necessary to be shown on a criminal indictment, yet such a promise is not one of the essential elements in a civil action for damages. Intercourse induced by persuasion, deception, enticement, or other

artifice will suffice; for of such is the essence of the injury. But the mere proof of intercourse, and no more, is not sufficient to warrant a recovery. *Volenti non fit injuria.*"

The lower court did not interpret correctly the words which we have copied and the law applicable to the case, judging from the paragraphs of its opinion which we reproduce below:

"In the testimony of the plaintiff we do not find the stratagem which constituted the deception, the artifice, the false promise (aside from that of marriage), which was employed by the defendant to cause her to surrender her chastity, virtue, and virginity. It may be that the allure of a marriage economically advantageous for the plaintiff weighed somewhat in her mind; but there is no evidence of that reiterated persuasion or incitement of the woman's desires, on the part of the defendant, to cause her to surrender to him. 24 R.C.L. 734 (5). And in the absence of such clear, strong, and convincing evidence, we must not leave the rights of the defendant unprotected, without forgetting, either, those of the plaintiff. It seems that the defendant (*sic*) puts much emphasis on the word 'seduction,' used in the English Text of section 58 of the Code of Civil Procedure, and she gives it a scope and extension which its legal interpretation does not, in our opinion, warrant.

"\*       \*       \*       \*       \*       \*       \*

"The evidence of the plaintiff renders transparent its essential and convincing elements and fails to leave in our conscience as judge that feeling of rest, confidence, spiritual tranquillity, and moral certainty which is necessary for a just, moral, and equitable decision. We do not find the means to which the seducer resorted and without which he would not have conquered the chastity of the plaintiff. The latter does not explain how her downfall occurred, nor does her evidence help her in this task.

"We have carefully considered the expert testimony and, giving it full credence, it does not produce any element of evidence against the defendant which could incline and determine the decision in favor of the plaintiff. The plaintiff may have been a virgin when she was examined by the doctor; but that she should have ceased to be one in the interval between one examination and another, is not, in itself, a fact which is adverse to the defendant. Aside from this, the cases have established that it is not necessary that the defendant (*sic*) be a virgin at the time of the seduction; it is enough that she be virtuous and chaste."

The courts have decided that the promise of marriage is one of the means to which the seducer frequently resorts to accomplish his purpose, but that this promise is not by any means a necessary and indispensable element for the seduction to be accomplished. That is to say, the sexual act may be performed and seduction accomplished without the existence of a promise of marriage. In the case of *Bradshaw* v. *Jones*, 103 Tenn. 331, 76 Am. St. Rep. 655, the court said:

". . . that any act, solicitation, or statement which overcomes the unwillingness of the woman and causes her to yield her virtue is sufficient."

In accordance with the rule cited, the injured person is not necessarily limited to a showing of a promise of marriage. Her sphere of action is broader, since, even in the absence of such a promise, she may show that she was induced to have intercourse by deception, enticement, or artifices of the seducer. However, the promise of marriage, when it exists, and when the intercourse has been accomplished under its exclusive influence, is sufficient to constitute a cause of action. Sexual intercourse in itself will not suffice, but it is sufficient when it is the consequence of the promise of marriage.

In the case of *Fletcher* v. *Ketcham*, 141 N.W. 916, decided by the Supreme Court of Iowa, it was said:

". . . We quote from appellant's brief the following, as stating the exact point made by counsel with reference to the matter now under consideration: 'Our contention simply is that where an unmarried couple have indulged in sexual intercourse with each other, proof of an engagement between them to marry is ordinarily not alone, and of itself, and without more, sufficient to establish a prima facie case of seduction against the man. In addition, there must be evidence of some artifice or wile practiced on the woman—there must at least be evidence of solicitation, importunity, or overcoming persuasion by the man and of at least some reluctance and misgiving and hesitation on the part of the woman.' We are constrained to hold that while there is no direct testimony from plaintiff as to what caused her to surrender her person to the defendant, yet the record is such as that a jury would have been justified in inferring that it was

because of a promise of marriage. There was ample testimony of a promise of marriage long before the sexual intercourse occurred, which promise was repeated, either in express terms or by necessary inference, from time to time, down to near the time when defendant married another. The intercourse occurred after defendant went to live at the plaintiff's home, and after defendant had made love to plaintiff and had promised to marry her. Whilst it would have been safer and better to have inquired of plaintiff as to what induced her to yield her person to the defendant, we, nevertheless, are constrained to hold that this may be found by inference from other facts and that it was a jury question to be determined upon all the testimony adduced."

There were two witnesses who testified that they had sexual intercourse with Irene Aponte: Pedro Castro and Rafael Escobar. The lower court sums up the testimony of these two witnesses as follows:

". . . Pedro Castro testified that he had known the plaintiff for more than three years; that he has had appointments with the plaintiff in different places and that he had intercourse with her toward the end of December 1930, and in the month of February 1931. Rafael Escobar testified that he met the plaintiff about the middle of the year 1930; that he had intercourse with her at the end of 1930 and at the beginning of 1931 . . ."

We have examined the testimony of these witnesses and neither of them says that he had sexual intercourse with the plaintiff in the middle or at the end of 1930. Both confine themselves to the statement that the acts occurred in 1931. If these witnesses, as the lower court says, had testified that they had intercourse with the plaintiff prior to the year 1931, their testimony would be in open conflict with the testimony of Doctor Moczó, who asserted that he examined Irene Aponte in February 1931, and that at that time she was a virgin. It was at the end of March of the same year that Doctor Moczó, in a new examination that he made of the patient, discovered that she had lost her virginity. Neither of these witnesses states the date in 1931 when the sexual acts mentioned took place. If we assume that Doctor Moczó told the truth, those acts, if at all true, must have occurred in Feb-

ruary or subsequent to that date. Irene Aponte alleged and testified that she was seduced in March 1931. The defendant has not shown when the sexual acts of which these two witnesses spoke took place, and the burden was on him to show that they were previous to those performed by the said defendant. Although the evidence of specific acts is admissible, without their having been alleged, it must be admitted that the plaintiff found herself at a disadvantage in having to face charges made at the trial, in which a measure of surprise entered.

The plaintiff vigorously denied the things imputed to her when she again took the stand to rebut the evidence of the defendant, but even though the acts attributed to her should be true, if they were accomplished after the date of the seduction, they cannot destroy the right of Irene Aponte to recover damages for the seduction. We quote the following from the case of *Shewalter* v. *Bergman*, 23 N.E. 686, decided by the Supreme Court of Indiana:

"We have no doubt that the court did right in excluding evidence tending to prove that after the seduction of the plaintiff her reputation was bad. If the plaintiff's reputation was good at the time she yielded to the embraces of the defendant, her subsequent downfall cannot affect her right to recover. Her subsequent conduct does not tend to prove that when the defendant seduced her she was not a chaste woman. Her ruined reputation, if it followed the seduction, may well be attributed to the defendant's own wrong; and of that wrong he cannot take advantage. The person who causes the bad reputation of another can take no benefit from his wrongful act."

The lower court speaks of a clear, strong, and convincing evidence. Naturally the evidence of the seduction must be sufficient to satisfy the conscience of the judge, but the evidence need not be such as is required in criminal cases.

In *Kralick* v. *Shuttleworth*, 289 Pac. 74, decided by the Supreme Court of Idaho in June 1930, it is said:

". . . . In a civil action for damages for seduction, all that is necessary to sustain a recovery is that there be a preponderance of

the evidence in favor of the plaintiff as in other civil actions. 2 Chamberlayne on Modern Law of Evidence, par. 998; *Nelson* v. *Pierce*, 18 R.I. 539, 28 A. 806.''

We have pointed out the errors which in our judgment were committed by the lower court, because of the influence which they undoubtedly exercised in the process of the judge's reasoning, leading him to establish conclusions based on mistaken premises. The lower court, giving full credence to the testimony of Doctor Moczó, says that it does not produce any element of evidence against the defendant which could incline the decision in her favor, that is, in favor of the plaintiff, whose name is not mentioned, undoubtedly due to an error. Doctor Moczó tells us that he examined the plaintiff in the month of February 1931, and that she was then a virgin. The expert does not mention the defendant, nor did he have reason for doing so. His statement was limited to a report of the examination he made of the patient. His testimony, however, is an important element, because it shows the virginity of the plaintiff on a fixed date. The loss of this virginity must necessarily have taken place after this date. The testimony of Irene Aponte shows that she was seduced during the first fifteen days of March, because she was examined by Dr. Moczó in said month, about two weeks after yielding to Alonso. Therefore, according to the plaintiff, only a few days passed between the seduction and the examination. The defendant confesses that he had sexual intercourse with Irene Aponte, but he does not fix the date, in spite of the fact that he knew the allegations of the complaint and that the injured party had testified that she was seduced in the month of March, 1931. The defendant admitted the sexual intercourse and did not contradict the testimony of the plaintiff as to the date on which it took place.

When Irene Aponte testified in rebuttal of the evidence of the defendant she did so with great energy. She was asked whether it was not true that, while living as the wife of a man named Rivera, she went, on November 23, 1931, to Doc-

tor Boneta for treatment for a hemorrhage produced by an abortion of two months and that she was treated by Doctor Boneta. The plaintiff answered that that was all a lie, and asked that they bring her this Rivera who said that. She was asked why she did not prefer that the doctor be brought and she answered: "The doctor and Rivera, too, because that has never happened to me." The defendant did not take the trouble to bring Boneta, or the man named Rivera, to show the truth of his insinuation. Although there is involved an act subsequent to the date on which the seduction occurred, the truth is that insinuations of such a character, entirely foreign to the evidence, cannot be sufficient to destroy the reputation of a woman and should pass without leaving an impression on the conscience of the judge.

Eleodoro Torres, an overseer formerly employed by the defendant, whose testimony shows that he is a disinterested witness, stated that Irene and Alonso were sweethearts and that not only did he know it personally but that it was public and everyone saw him visit Irene's home daily. Irene's reputation was splendid and she was a girl who busied herself with household duties. The witness is married and his family and that of Irene exchanged visits periodically. The evidence shows that the defendant frequently visited the home of Irene. His requests, his invitations, his rides produce the impression that they were means employed to accomplish his purpose. The lower court has committed manifest error in weighing the evidence. The seduction has been proved and the judgment must be reversed.

No evidence as to the financial situation of the defendant was presented. This information, which we would have taken into consideration in fixing the amount of the damages, is lacking, and in the absence thereof we fix the amount to be recovered for the damages suffered by the plaintiff at $2,000, with costs.

The judgment appealed from must be reversed and another rendered instead in accordance with the terms of this opinion.

Mr. Justice Wolf agrees with the result.